Charles B. Honikel, Ref.
The plaintiff seeks judgment against defendant, declaring void and canceling of record certain real estate taxes, and a refund to it of amounts paid. Plaintiff claims exemption from taxation by virtue of subdivision 1 of section 420 of the Real Property Tax Law (eff. Oct. 1, 1959) and former subdivision 6 of section 4 of the Tax Law.
The individual items, including reassessed school taxes and interest, are:
Taxes for 1956, payable in 1957, $2,205.82, paid by plaintiff; taxes for 1957, payable in 1958, $2,401.76, paid by plaintiff; taxes for 1958, payable in 1959, $2,767.27, redeemed from tax sale to the county by United Society of Believers, as mortgagee; taxes for 1959, payable in 1960, $2,463.63, included in item of $6,631.58 paid by Ralph O. Hoffman, referee in mortgage foreclosure.
*776 The assessors were apprised of plaintiff’s objection to the assessments, although formal protests preliminary to tax review proceedings under article 13 of the Tax Law (now Real Property Tax Law, art. 7) were not filed.
Plaintiff is a membership corporation. It has no affiliation with any formally organized church or religion. Its certificate of incorporation contains the following statement of purposes:
“ (a) To spread the Gospel of the Lord Jesus Christ throughout the United States of America and other countries through the printed page, through Bible conferences, through radio programs and television pictures, through the support of missionaries throughout the world, and through any other method.
“ (b) To devise, provide and pursue ways, methods and means and to receive and acquire money and funds for the distribution of Bibles, Testaments, Tracts, religious periodicals and portions of the Holy Scripture, and to print, publish and distribute books containing religious songs, teachings and readings, and to issue said Christian literature, periodicals and pamphlets as may be helpful and which will serve to carry out the purposes herein.
“ (c) To support teachers, preachers and missionaries within the United States or in foreign fields to spread the Gospel, especially to child and youth.
“ (d) To purchase, lease, own, mortgage, sell and manage real estate, buildings, and lands, farms and accommodations to be used in conjunction with the training, teaching and houseing [sic] of Missionaries, preachers and religious workers, and to otherwise acquire real estate, by gift or devise necessary for any of the purposes herein set forth.”
In my opinion paragraph (d) of the certificate of incorporation does not limit the power of plaintiff “ to purchase, lease, own, mortgage, sell and manage ” real property solely in conjunction with the training, teaching and housing of missionaries, preachers and religious workers. The words, in my opinion, constitute a grant of authority, not a limitation. Section 13 of the General Corporation Law (in effect until Sept. 1, 1963) provided: “ 1. A corporation shall not possess or exercise any powers unless given by law, or necessary to the powers so given. 2. The certificate of incorporation of a corporation may contain any provision for the regulation of its business and the conduct of its affairs, and any limitation upon its powers, or upon the rights of its stockholders or upon the powers of its directors and members, which does not exempt them from the performance of any obligation or duty imposed by law.” Subdivision 3 of section 14 of the General Corporation Law (in effect until September 1; 1963) granted to every corporation, though not *777 specified in the law under which it is incorporated, the power “ To acquire property for the corporate purposes by grant, gift, purchase, devise, or bequest, and to hold and to dispose of the same, subject to such limitations as may be prescribed by law.”
Section 300 of the Real Property Tax Law (formerly Tax Law, § 3) subjects to real property taxation all real property within the State unless exempt therefrom by law. The exemption statute is to be construed strictly against those arguing for nontaxability. (People ex rel. Mizpah Lodge v. Burke, 228 N. Y. 245.)
The purposes set forth in plaintiff’s certificate of incorporation are within the exemptions authorized by subdivision 1 of section 420 of the Real Property Tax Law (formerly Tax Law, § 4), since the statute prima facie grants an exemption to a corporation organized exclusively for bible, tract and missionary purposes.
Although no other interpretation can be given the articles of incorporation than that plaintiff is organized exclusively for purposes which meet the exemption requirements of the statute, the actual operations of the corporation must be examined since there is the additional statutory requirement that the real property be used “ exclusively for carrying out thereupon one or more of such purposes ”. Actual use of the real property might not correspond with the declared purposes stated in the certificate. Further the statute mandates that if the real property is used for activities and purposes other than those authorized by and stated in the certificate of incorporation, the exempt status is lost. The court stated in Good Will Club of Amsterdam v. City of Amsterdam (31 Misc 2d 1096, 1098): “ a reasonable compliance would mean that not only must the plaintiff’s articles of incorporation and by-laws admit of no construction other than strict adherence to the activities enumerated in the statute, but further, that actual use and operation must correspond and agree with the declared use stated in the certificate and by-laws ’ ’.
Crusade for Christ, as an unincorporated group, or its president and treasurer, Mr. William H. Vogt, had been active in gospel work long before 1956 and had conducted radio broadcasts in Pittsfield, Massachusetts, North Adams, Massachusetts, and Albany, New York, for some years prior to the purchase of the real property for which exemption from taxation is now sought.
The certificate of incorporation was approved by a Justice of the Supreme Court November 18, 1955 and was filed in the office of the Department of State on December 1, 1955.
*778 On June 15, 1956 plaintiff purchased a tract of land described in one of plaintiff’s brochures as more than four hundred acres and by the president and treasurer as about five hundred acres, upon which were located 13 buildings. The latter were in dilapidated condition at the time of purchase.
Plaintiff named the real property “ Lebanon Boys Village A fund-raising campaign in connection therewith was conducted by plaintiff and from the campaign the down payment upon the purchase of the real property, $10,000, was realized.
Plaintiff’s Exhibit 9 is a brochure which was used by plaintiff. It is entitled “Lebanon Boys Village ”. On the cover is the picture of a boy about to enter a door with the words “ Your Donation will open the Door for him give now ! ’ ’. This brochure contains aerial photographs of portions of the property. One of the photographs is accompanied by a message from the Bible and the words “ help! Save a Boy at Lebanon boys village sponsored by crusade eor Christ ”. Excerpts from the brochure are:
On the Western slopes of Mt. Lebanon a gigantic vision is taking shape which you can help build into a glorious reality — a boys orphanage which can shelter and give guidance to several hundred youngsters in need of these vital advantages.
See the grandeur of this location for yourself! It is but a short drive along Route 20, west of Pittsfield. When you return from this wonderful scene, you will want to give generously in order that you can more fully enjoy the advantages which your parents were able to give you through your boyhood and youth.
Come with us to Mt. Lebanon! As we approach the property that the Shakers built in the days of their greatness, we turn south from Route 20, at the Darrow School sign. We first reach the Big Stone Barn, on the right, with the pitched roof . . . the world’s largest stone barn. It was built in 1860. It is 296 feet long, 50 feet wide and 5 stories high at the rear. Inside great sections are paneled in plank now mellowed to hues that would stir cabinet makers to envy.
The top floor of this huge structure is ideal for The Crusade for Christ Auditorium. It will seat over 1500 persons and the acoustics are perfect for music and group singing. Other barn floors can be used for indoor recreational purposes.
The next building on the right is in good condition and can be used for Administration purposes. The Big Dormitory for boys is of later architecture than the earlier Shaker buildings. It has examples of careful craftsmanship in gracefully turned stair railings, in cabinets and cupboards. This building has 52 large airy rooms and will comfortably house several hundred boys.
Behind the Boys Dormitory is a building which could be used for private living quarters for the Director and other administration personnel. The Foundry could be used as a Workshop or Vocational Guidance center.
There is still another building which could be used for Bible Study, Music or Handicraft.
With this property converted into a village for orphan boys, you could shut your eyes and see the happy life going on here.
All in all, more than 400 áerés óf the finest farm land with 13 huge sturdy buildings comprise this property, which is located on both sides of Route 20.
*779 It has been vacant for years but The Crusade for Christ has a great plan for it, and you can now have the privilege of being a part of this vital, life-giving project for boys left alone in the world.
Help us to make this vacant village into a happy boys orphanage and a Lighthouse for the Lord!
Certain mimeographed letters on Crusade for Christ letterheads and over the typed name Bill Vogt and brochures which are a part of plaintiff’s Exhibit 17 show the development of plaintiff’s plans for the use of the property:
Letter dated April 20, 1954:
That is why I write you, for I am anxious for all of you to share with me in founding a great testimony for the Lord in America, crusade for Christ, of which I am the Director, is purchasing ‘ Shaker Village ’ located on U. S. Route 20 in Lebanon, New York.
This historical, picturesque property covers more than 400 aeres and has 13 buildings, 2 being dormitory type, 5 stories high and having over 70 large rooms. The property is ideal for a boys’ orphange, which, with the Lord’s help, we intend to start. When I say that over 500 homeless, unfortunate boys can be housed and trained and told of Jesus’ love for them at this place, I am not exaggerating one bit. The magnificence of the property is breathtaking, and the magnitude of the job the Lord has planned for us can only be fully realized as the Lord pours out His Spirit upon us. I must have your prayer, for we need $50,000.00 to buy it, and we have just sixty days (until June 20, 1954) to raise the money.
Brochure dated May 15,1954:
The first big step toward the acquisition of the Shaker Village property for lebahoh boy’s village was taken on April 29 when we paid $1,000.00 to the Shakers, signed the papers, and obtained an option on the property.
Brochure dated November 26, 1955:
In this brochure appeal is made for contributions “ for the Orphanage ” and prayer is requested for “ The seventeen-year old boy we have here ” and “ the fourteen-year old boy who may soon be with us ”.
Letter dated May, 1956:
April 29 was a time of celebration for us, for on that date two years ago we, because of your prayer and your gifts, were able to get an Option on the property now known as lebanoh boys’ village. We have not progressed in the two years as far as we would have liked to, but, friends, a lot of work has been done and we have experienced many blessings and answers to prayer from the Lord. And, more important, our Saviour, Jesus, has given us a rich opportunity in bringing two boys now to the Village of God’s teaching, where you and I through prayer and patience might bring them up in the nurture and admonition of Christ.
Two years ago it was our desire to have twenty boys in about two months. The way it has worked out is two boys in two years.
Letter dated November, 1956:
The greatest lesson that has been taught us is that we must have our own School in operation first. It would be virtually impossible to help the boys and the girl who have been at the Village when the influences at school embodying the major part of the day were against the teaching which we feel they should *780 have. We were warned about this at the start by one of long experience and wisdom, but we felt we could use the public school until we were established. We confess we were mistaken.
, Therefore, at our Victory Dinner October 27 we presented to our friends the following plan for a Christian Day-School to be set up here, a school teaching vocational and classical subjects open to the children the Lord gives to our care and open to any of your children either as a day or a boarding school. You know we have the buildings. We have the acreage, and boys and girls are waiting.
Letter dated January, 1957:
In fact, though our desire is never to refuse anyone admittance, yet during the month of December alone we had nine applicants (eight boys and one girl), whom we did not accept, because we would be unable to care for them in the right Christian way. The chief problem is their schooling. It is a terribly frustrating feeling to have to turn away children who need our help. At the urging of the Welfare Board we did take into our home and family a boy named Danny. Here I must apologize to those of you who attended our October 27, dinner, as I then stated that we would take no one till our school was in operation. The Lord led, and Betty and I could do nothing else.
Letter dated June, 1957:
Finally, we are starting our School here this September — grades 7-12, thus enabling us to receive boys and girls who have applied. ... It is our plan also to open the doors of this School for boys and girls of the area who wish to take advantage of that which will be offered here and the benefits of a Christian Day School. If there are enough young people in Pittsfield and its suburbs who wish to attend, we would consider running a bus daily; likewise, for Troy and Albany. If you desire your children to attend, please let me know at once.
Letter dated July, 1957:
Remember, you can take advantage of this School for your children, sending them here daily on a Christian Day School basis or as boarders. All over the country Christians are turning to such a school as ours in an effort to combat the insufficiency of the public school. Here at Lebanon boys village Christ will be honored. Every class will be Christ-centered, and Biblical courses will be required along with the standard secondary school courses.
Letter dated October, 1957 :
You through prayer and your financial support are taking part in one of the greatest and most beneficial works for the Lord that has occurred in the New England and Eastern New York State area. The response to the opening of our school, especially in the day-school phase, has been significant. We now have, including my three children, nine in attendance and could have a great many more if we had the teachers. Even so, many students have stated that they are coming this January. The grades now being taught are fourth, sixth, eighth, ninth and eleventh. Since we have not been able to get teachers as yet, Betty is teaching the fourth and sixth grades, and I am handling the rest.
Letter dated May, 1959:
■ It is our privilege to graduate our first high school student, and two will be graduated from the grammar grades.
*781 Letter dated September-October, 1959:
Also the Christian School is in its third year of operation with grades two, three, six and seven being taught. In. the high school department the standard college preparatory subjects of the first year are now being given.
Letter dated May, 1960:
180 days out of the year, for the past three years, we have conducted the Christian Day School, Grades 2 through 12. In general the public school curriculum is followed, but we add to this a Christian interpretation and presentation.
After plaintiff acquired title to the real property it proceeded without delay to do considerable work in repairing the buildings and making them usable. The main building was used as the residence of Mr. William H. Vogt and his family as well as for school purposes and the boarding of children. The school was referred to as a “ parochial school ”. Tuition was charged at the rate of $10 per month per pupil. On November 28, 1958, an inspection of the school was made by Werner H. Buef, Supervisor of Elementary Education for the State of New York. At the time of Mr. Buef’s visit 18 children were in attendance, three of whom were the children of the president and treasurer of the corporation, Mr. William H. Vogt. The maximum attendance was 23 pupils. Mr. Buef’s tabulation of attendance as of the date of his inspection is:
GRADE PUPILS
Second 1
Third 1
Fourth 1
Fifth 4
Sixth 2
Seventh 2
Eighth 2
Ninth-Twelfth 5
In addition to the children of Mr. and Mrs. Vogt, three or four children lived at the premises at various times and one of them had been referred by the Welfare Department of Paterson, New Jersey; they resided in the same building and shared some accommodations with the Vogt family.
Subdivision 1 of section 11 of the Membership Corporations Law provides: “If the certificate of incorporation specify among the purposes the care of destitute, delinquent, abandoned, neglected or dependent children * * * or the placing-out or boarding-out of children, the approval of the state board of social welfare shall be endorsed thereon or annexed thereto,” *782 Subdivision 2 of section 11 of the Membership Corporations Law states: “ If the certificate of incorporation specify a purpose for which a corporation may be chartered by the regents of the university, the consent of the commissioner of education to such filing shall be endorsed thereon.” It does not appear from the record that any such endorsements were obtained by plaintiff.
I do not find any authority in plaintiff’s certificate of incorporation for the operation of an orphanage or school. I must hold, therefore, the statutory requirements (a) that de facto use be within the scope of the stated purposes of organization contained in the certificate of incorporation and (b) that the real property be used for no purpose other than for the purposes stated in the certificate of incorporation, have not been satisfied.
Decision must be made as to how much of this approximately 450-acre tract of land and how many of the 13 buildings located thereon are to be denied exemption from real property taxation because of the unauthorized activities, or, conversely, how much of the property was used exclusively for purposes within the corporate charter.
There is conflicting evidence as to how much of the property was actually used for any purpose. Mr. William H. Vogt stated in an examination before trial conducted in 1962, in answer to the question “ How much of this land have you used or occupied in any fashion since June 15, 1956 — used, occupied, cultivated? ” — “ An acre or two ”. Testimony at the trial indicated use of a more extensive area. The law imposes upon plaintiff the burden of proof and the preponderance of evidence must show clear entitlement to exempt status before this relief may be granted. There is evidence of activities, such as origination of Gospel broadcasts, youth fellowship meetings and other gatherings, which were within charter purposes; but the difficulty here is that no clearly identifiable portion of the real property was used exclusively for such authorized activities. Taking the record in its entirety, I cannot find that during any one of the tax years in question (1956-1962) any portion of the property was used for the declared purposes stated in the certificate of incorporation and for no other purpose.
Decision was reserved upon three motions made by defendant’s attorney during the trial. These motions and my decisions thereon are:
To dismiss as a matter of law so much of the complaint as seeks to recover taxes paid by plaintiff in 1957 on the ground that under section 9 of the Tax Law (now Real Property Tax Law, § 302) the property was liable for taxes since title passed to *783 plaintiff after June 1,1956. In view of my decision on the merits that plaintiff did not qualify for exemption from real property taxation in any of the years in question, including 1956, and that plaintiff is entitled neither to declaratory judgment nor to refund, the issue raised by the motion is academic and, therefore, not passed upon.
To dismiss the complaint as a matter of law on the ground that the action is for declaratory judgment and was not brought under article 13 of the Tax Law (now Real Property Tax Law, art. 7) which the defendant contends is the plaintiff’s sole remedy. Denied.
To dismiss the complaint as a matter of law on the ground that the action was not brought within the time limit set under section 290-a of the Tax Law (now Real Property Tax Law, § 702). Denied.
The foregoing opinion states the facts which I deem essential as required by CPLR 4319 and 4213, and accordingly plaintiff’s requests for findings of fact and conclusions of law are not passed upon.
For the reasons stated I must conclude plaintiff is not entitled to the relief sought. Its complaint is hereby dismissed, with costs, and judgment may be entered accordingly.